**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **P. MARIE RANDON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO.: ______________** |
| | ) | |
| **VANDERBILT UNIVERSITY, d/b/a** | ) | |
| **VANDERBILT UNIVERSITY SCHOOL** | ) | |
| **OF MEDICINE,** | ) | |
| | ) | **JUDGE _________________** |
| **Defendant.** | ) | |

# COMPLAINT

Plaintiff, Peggy Randon (Randon), by and through her undersigned counsel, for her Complaint against Vanderbilt University, d/b/a Vanderbilt University School of Medicine ("VUSM") alleges:

## INTRODUCTION

1. This case concerns Vanderbilt's failure to provide reasonable clinical and didactic accommodations to a medical student with a documented disability and its subsequent dismissal of that student based on an asserted "inability to consistently self-correct and sustain professional behavior," related to her disability, without first evaluating her ability to meet Vanderbilt's unchanged requirements with reasonable accommodation.

2. Randon was enrolled in Vanderbilt's Medical Scientist Training Program ("MSTP"), pursuing combined M.D. and Ph.D. degrees.

2. Before Vanderbilt dismissed her on August 18, 2026, Randon had passed every VUSM course and clerkship and had never received a failing course or clerkship grade.

3. During Randon’s 2025-2026 clinical year, a Vanderbilt University Counseling Center psychologist diagnosed her with Autism Spectrum Disorder (“ASD”), Level 1, Generalized Anxiety Disorder, and Major Depressive Disorder. These impairments substantially affect, among other things, major life activities including concentrating, communicating, task shifting, prioritizing, and interacting with others. Vanderbilt’s FMK Promotions Committee had also been aware since 2023 that Randon experienced anxiety and depression.

4. The autism diagnosis specifically described difficulty shifting between tasks; difficulty prioritizing mandatory work; distress when expectations changed suddenly without explanation; difficulty interpreting social and nonverbal cues; uncertainty about when conduct was being poorly received; and sensory dysregulation.

4. The psychologist recommended academic accommodations addressing functional impairment from autism and separately recommended autism-specialized executive-function support.

5. None of those limitations surfaced as a concern about Randon's care of patients. She received “Target” in Patient Care in every core clerkship and elective, and none of the concerns Vanderbilt later cited involved patient harm, unsafe care, deficient clinical reasoning, or mistreatment of a patient. Clinicians who directly observed her wrote that she was "fantastic with patients and their families," that "several patients [went] out of their way to tell us how great she was," and that she "showed maturity and comfort level at the bedside that [they] often don't see in fourth year students."

6. The difficulties Vanderbilt identified arose instead in scheduling, forms, and perceived communications deficiencies: the areas the evaluation documented, and the areas her requested accommodations addressed.

7. Notice to Vanderbilt preceded Randon's October request for accommodations. On September 2, 2025, Vanderbilt UCC Associate Director of Clinical Operations, Dr. Melissa Porter, provided the FMK Promotions Committee a letter stating there was "evidence suggesting some of the interpersonal challenges" Randon had experienced were likely related to Autism Spectrum Disorder and recommending an ASD-specialized executive coach for areas "beyond the scope of the UCC."

8. On September 16, 2025, Randon told Deans Amy Fleming and Kimberly Vinson that her evaluation was pointing to ASD.

9. On October 4, 2025, Randon provided Vanderbilt's Student Access office with the full report and requested accommodations beyond the testing environment.

10. On October 10, 2025, Vanderbilt approved extended examination time and testing breaks but treated her clinical and didactic requests separately.

11. Randon specifically requested a consolidated, authoritative "passport"-style source for required clinical activities, dates, deadlines, and logistics.

12. In the Student Access process, including a virtual meeting about her non-testing needs on October 14, 2025, she also raised broader categories of support concerning notice and clarification of schedule or requirement changes, direct and actionable feedback when concerns arose, and brief disability-related regulation breaks or sensory support, among other requests. Those categories mapped directly onto the evaluation's documented executive-functioning, social-communication, and sensory-regulation limitations.

13. Those requested modifications did not waive Vanderbilt's attendance, punctuality, professionalism, communication, patient-care, clinical, or academic standards; they concerned the

means by which Vanderbilt communicated and organized its requirements so Randon could meet the same standards.

14. Comparable structures already existed within Vanderbilt's clinical curriculum. Pediatrics, Medicine, Psychiatry and Surgery used consolidated organizational materials ("passport") listing requirements and logistics with dates and times; In each of those four clerkships Randon received Target ratings in all six competency domains.

15. Across the FCC year, including core clerkships, electives, and longitudinal courses, Randon received "Target" ratings, the highest possible, in 61 of 66 final competency domains. She passed all six core clerkships. Her final core clerkship, Surgery, concluded at "Target" in all six domains, including Professionalism and Interpersonal and Communication Skills; faculty documented that she was "always prompt to rounds and the OR," prepared, receptive to feedback, and "very coachable."

17. Vanderbilt nevertheless dismissed Randon on August 18, 2026. Its stated rationale was not that she failed the curriculum or could not care for patients. Instead, Vanderbilt concluded that persistent Professionalism and Interpersonal and Communication Skills concerns reflected an "inability to consistently self-correct and sustain the expected professional behaviors."

18. As early as September 2025, senior VUSM officials had notice that Randon's evaluation pointed to ASD; by October 2025, Vanderbilt had the completed diagnoses, documented functional limitations, and Randon's formal non-testing accommodation request.

19. Vanderbilt then had approximately ten months in which it was positioned to respond before dismissal. It never evaluated Randon's capacity under an individualized clinical or didactic accommodation addressing those barriers before concluding that she lacked the capacity to correct and sustain the required behavior.

20. The actionable accommodation period concerns Vanderbilt's conduct after it received the completed evaluation and specific October 2025 requests and was in a position to respond. Before then, Vanderbilt was fully aware of Randon's pre-request record and advanced her into clinical training, prescribed prospective remediation and monitoring, and represented that she was capable of success.

21. Randon seeks reinstatement and reasonable accommodations enabling her to satisfy Vanderbilt's unchanged standards. In the alternative, Randon seeks all damages available to her under federal and state law for Vanderbilt's unlawful conduct.

## PARTIES, JURISDICTION, AND VENUE

22. Plaintiff P. Marie Randon is domiciled in Michigan and is a citizen of Michigan. She was enrolled in Vanderbilt University's MSTP and VUSM M.D. program.

23. Defendant Vanderbilt University is a private nonprofit university incorporated in Tennessee with its principal place of business in Nashville, Davidson County, Tennessee. Vanderbilt operates VUSM and the MSTP, including a "postgraduate private school, or other place of education" within the meaning of 42 U.S.C. § 12181(7)(J).

24. Vanderbilt receives federal financial assistance and is subject to § 504 of the Rehabilitation Act, 29 U.S.C. § 794.

25. This action arises under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181–12189, and § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction over the related Tennessee-law claim under 28 U.S.C. § 1367. Plaintiff also pleads diversity jurisdiction under 28 U.S.C. § 1332 because Randon is a citizen of Michigan, Vanderbilt is incorporated in Tennessee and has its principal place of business in Tennessee, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

26. Venue is proper in this District under 28 U.S.C. § 1391(b) because Vanderbilt resides in this District and a substantial part of the events and omissions giving rise to the claims occurred here.

## COMMON ALLEGATIONS

**A. Randon entered Vanderbilt with an exceptional academic, scientific, and public-service record.**

27. Before matriculating at Vanderbilt, Randon had demonstrated sustained academic achievement and distinction across science, public service, and the arts.

28. Randon graduated with High Honors in Microbiology from the University of Michigan in 2021 after completing an honors thesis concerning mechanisms of checkpoint-inhibitor cancer immunotherapy.

29. She received competitive national research and public-service honors, including a Projects for Peace Fellowship, a U.S. Department of State Office of International Health and Biodefense Fellowship, an NIH Minority Health Research Training Fellowship, and an NIH Intramural Research Training Award Fellowship.

30. Randon also developed a substantial record of community service and creative work. She taught visual art in youth detention centers in Detroit, founded the Global Surgery Student Alliance at the University of Michigan, received a commission from the University of Michigan's National Center for Institutional Diversity, and exhibited work at the Museum of Contemporary Art Detroit and the College for Creative Studies.

31. After graduating from Michigan, Randon continued her scientific training at the National Institutes of Health as an Intramural Research Training Award Fellow.

32. Randon developed an extensive scientific research record. That record includes numerous first and co-authored peer-reviewed publications, dozens of scientific conference presentations, and several invited oral presentations.

33. Between 2022-2023, among several other institutions, Randon was admitted to Vanderbilt University School of Medicine's Medical Scientist Training Program (MSTP) and elected to begin her medical journey pursuing an M.D./Ph.D as part of the VUSM Class of 2030.

**B. Vanderbilt repeatedly permitted Randon to continue and advance before the October 2025 accommodation request.**

34. Randon continued conducting and publishing scientific research, as well as engaging in community service work while enrolled at Vanderbilt.

35. In March 2024, Randon's peers nominated her for Vanderbilt's Robert F. Miller Award, which recognizes members of the Vanderbilt community for significant service to their communities; Randon was the only first-year student in the School of Medicine to receive the award that year.

36. During the 2023-2024 academic year, Randon disputed or contextualized many of the professionalism allegations Vanderbilt documented, but Vanderbilt did not amend any records that were inaccurate or misleading.

37. After reviewing the pre-Foundations of Community Care ("FCC") record, Vanderbilt required Randon to repeat the Foundations of Medical Knowledge ("FMK") phase and described repetition as an opportunity to strengthen her foundation for later clinical training rather than as a punitive action.

38. Vanderbilt later stated that, if Randon engaged in a personalized learning plan, feedback, and coaching, it was "confident" she was "capable of success in the program." Vanderbilt accepted her completed FMK remediation and advanced her into FCC clinical training.

40. On September 16, 2025, Vanderbilt promoted her into FCC while continuing Probation and identified six prospective measures by which her progress would be monitored and whether probation could be lifted. Those measures included communication-focused coaching with Dr. Heather Davidson; EXCEL work with Dr. Sandra Moutsios; use of approved communication and absence procedures; completion of MCT observations without major concerns; workplace-based assessments ("WBAs") designed to obtain a broad longitudinal view; and longitudinal follow-up with clerkship directors and FCC leadership.

41. Before any FCC concern had been documented, on Randon's VSTAR portfolio self-assessment form, she separately asked her Portfolio Coach for strategies to organize the many clinical, assessment, seminar, and longitudinal-course obligations she was expected to track. Yet, Randon never received any.

43. VUSM's Student Progress and Promotion Policy required a probation letter to identify the conditions for removal of probation, "including an expected time frame." The September 16, 2025, letter prescribed six prospective monitoring and remediation measures but *did not* identify an expected time frame for satisfying them or for determining whether probation could be lifted.

44. The September monitoring measures predated the completed autism diagnosis and October accommodation request; Vanderbilt did not subsequently redesign them as an individualized accommodation plan addressing the functional limitations Dr. Sandhu documented.

45. Vanderbilt's Portfolio Review Process states that, during student-coach meetings, coaches and students "review assessments, discuss and attempt to resolve any differences in progress level determinations, and review the learning goals and plans for appropriateness." It further provides that unresolved differences are identified in the coach assessment and that the student self-assessment, coach assessment, and joint assessment are retained in the portfolio and

available to the Promotion Committee. Randon raised disputed performance characterizations and supplied formal learning goals to her Portfolio Coach, but the prescribed review, attempted resolution, and documentation of those disputes did not occur with her.

**C. Vanderbilt diagnosed autism and documented functional limitations directly relevant to the requested modifications.**

46. In 2025, Randon underwent a formal autism diagnostic evaluation through Vanderbilt's University Counseling Center with Becca Sandhu, Psy.D., over sessions on June 30, July 14, and September 19, 2025.

47. The evaluation used multiple standardized measures, including the RAADS-R, SRS-2 with self- and observer-reports, CAT-Q, PAI, ASR/ABCL, and a structured diagnostic interview.

48. Dr. Sandhu diagnosed Randon with Autism Spectrum Disorder, Level 1, Generalized Anxiety Disorder, and Major Depressive Disorder. The evaluation concluded that Randon demonstrated significant differences in social-emotional reciprocity, nonverbal communication, and developing, maintaining, and understanding relationships, together with repetitive or inflexible patterns of behavior, hyperfixation, sensory differences, and executive-function differences that negatively affected functioning.

49. The evaluation documented that Randon had difficulty knowing when others were upset by something she had said or done, often could not determine why an interaction was being poorly received, and had to ask probing questions to gain clarity in these areas. It also documented difficulty interpreting nonverbal behavior and social nuance.

50. The evaluation further documented "significant difficulty shifting between tasks," including a tendency to finish one task before shifting to another; difficulty prioritizing work; distress when expected routines suddenly changed; and executive-function differences affecting the completion of mandatory academic tasks.

51. The evaluation stated that apparent inattentive symptoms were better understood as executive-function differences often experienced by autistic individuals.

52. Dr. Sandhu recommended academic accommodations for functional impairment caused by autism, expressly identifying sensory regulation, executive functioning, and social communication as examples of relevant impairment. She directed Randon to provide the evaluation to Student Access if accommodations would be useful.

**D. Randon timely invoked Vanderbilt's accommodation process, requested disability-linked clinical and didactic modifications, and did not abandon it.**

53. Vanderbilt had notice of the emerging disability before Randon's formal accommodation request. Dr. Porter's September 2, 2025, letter to the FMK Promotions Committee documented Randon's consistent and collaborative engagement, willingness to accept feedback, and efforts to alter her behavior. It further stated there was "evidence suggesting some of the interpersonal challenges" Randon had experienced were likely related to ASD and recommended an ASD-specialized executive coach for areas "beyond the scope of the UCC."

54. On September 16, 2025, Randon disclosed to Deans Fleming and Vinson that the evaluation's preliminary findings pointed to ASD.

55. On October 4, 2025, after testing was complete, Randon emailed Student Access, disclosed the completed diagnosis, attached Dr. Sandhu's full evaluation, and asked to work with Vanderbilt on accommodations "outside of testing scenarios, too."

56. The FMK Cycle 3 letter delivered to Randon on September 16, 2025, advanced her into FCC despite continuing concerns and stated that the Committee was "hopeful" that, with monitoring and close oversight, "all behaviors of concern will be completely alleviated."

57. It promised a "formal handoff" to the FCC Promotions Committee and an "extensive handover" to FCC leadership and each clerkship and longitudinal director so Randon's

performance could be monitored closely and "appropriate resources to support [her] success" would be provided as needed.

58. Vanderbilt thus established an information pathway from the FMK process, which had received Dr. Porter's disability-related letter, to the FCC process that later evaluated Randon's clinical-year performance. Personnel continuity also existed between the two phases; Dr. Anna Edmondson served on both the FMK and FCC Promotions Committees.

59. Dean Fleming was among the senior VUSM officials with pre-FCC notice of the emerging diagnosis and recommended support. She also served as the Senior Associate Dean for Medical Student and Alumni Affairs, the official whom VUSM's dismissal policy charged with hearing and presenting a student's mitigating circumstances before a dismissal review.

60. Student Access directed Randon to submit an Additional Accommodation Request through the Commodore Access Portal, which Randon did.

61. On October 10, 2025, Student Access Services ("SAS") approved 100% extended examination time and breaks as needed. It separately recognized that Randon was requesting "supports in the clinical and didactic setting" and scheduled a meeting concerning those requests.

62. Randon requested that her updated disability information be distributed to relevant faculty and deans.

63. At the October 14, 2025, virtual meeting and in surrounding communications with SAS, Randon discussed clinical and didactic barriers and requested a consolidated "passport"-style source for required activities, dates, deadlines, and logistics. She also raised broader categories of support concerning timely notice and clarification of changes, direct and actionable feedback when a concern arose, brief disability-related regulation breaks or sensory support, and access to

recorded or asynchronous didactic content where recordings already existed and attendance requirements permitted, among other requests in line with her documented disabilities.

64. The categories Randon raised were disability-linked rather than generalized preferences: consolidated information and clarified changes addressed documented difficulty shifting tasks, prioritizing obligations, and adapting to unexpected changes; direct feedback addressed documented difficulty determining from social and nonverbal cues what conduct was being poorly received or required correction; regulation breaks or sensory support addressed documented sensory dysregulation; and, where recordings already existed and attendance requirements permitted, recorded or asynchronous access reduced disability-related barriers without altering attendance requirements or substantive course expectations.

65. Student Access did not approve any measures as formal clinical/didactic accommodations.

66. Instead, Student Access directed Randon to work with VUSM personnel concerning her clinical and didactic needs.

67. Student Access did not identify an effective alternative clinical or didactic accommodation.

68. On October 20, 2025, Student Access followed up regarding the clinical and didactic requests and reiterated that Randon could work with medical-school leadership concerning implementation and could return to Student Access with future requests.

69. Randon followed that direction and disclosed the diagnosis and need for accommodations to VUSM personnel, including Clerkship Directors, Dr. Andrew Giritharan and Dr. Maya Patel, Dr. Davidson, Dr. Moutsios, Dr. Brantley, and Medical Student Affairs leadership, Deans Fleming and Vinson.

70. Vanderbilt's published Student Access guidance recognizes that accommodations are "commonly used in VUSM professional degree program learning settings" and that didactic, clinical, lab, and simulation settings may require different accommodations. For M.D. students, Vanderbilt routes accommodation letters through the Associate Dean for Medical Student Affairs to facilitate implementation and communication with relevant faculty and program personnel. Vanderbilt's Student Access Director has likewise described Vanderbilt's accommodation process as reviewing the student's documented functional limitations against the requirements of the course and working with the instructor to reduce identified barriers while preserving the course's essential functions and outcomes.

70. Before dismissing Randon, Vanderbilt did not implement an individualized clinical/didactic accommodation addressing any of the executive-functioning, social-communication, or sensory-regulation barriers Randon had raised through the prescribed process, nor did it identify an effective alternative individualized accommodation that it would implement for those barriers.

71. Translating documented functional limitations and broadly identified needs into workable, site-specific modifications is the function of an individualized accommodation process; Vanderbilt never completed that process with Randon.

72. During the *same* academic year, Vanderbilt operated a neurodiversity-focused Writing Studio pilot, available through Student Access referral, that provided individualized assistance with planning, scheduling, organization, accountability, and management of academic work--the same functional domains implicated by Randon's evaluation and requests. Student Access referred over a dozen students to that program during AY 2025-26 who became regular clients.

73. Vanderbilt did not identify or offer that program to Randon during the October accommodation process and did not refer her while she remained enrolled; only after dismissal did Student Access identify the program as a source of broader organizational support and initiate a referral.

74. The absence of an individualized non-testing accommodation affected Randon's access to the FCC clinical and didactic program itself: she continued to encounter disability-related barriers in receiving, organizing, clarifying, and acting upon required scheduling, logistical, instructional, and corrective information in the settings for which she had requested accommodation.

75. Randon nevertheless participated in the remedial resources Vanderbilt assigned, including EXCEL, communication coaching, Portfolio Coach meetings, faculty feedback, and longitudinal assessments. Before any FCC professionalism concern arose, she affirmatively asked for organizational strategies in her VSTAR self-assessment; she then established formal learning goals targeting professionalism, communication, reliability, calendaring, and direct feedback. Throughout FCC, she repeatedly sought feedback concerning those same domains.

**E. Vanderbilt's own FCC record documented qualification, correction, and successful performance under structure and feedback.**

76. Randon passed each of the six core clinical clerkships: Pediatrics, Psychiatry, Medicine, Neurology, OB/GYN, and Surgery.

77. Vanderbilt evaluates medical students longitudinally across six core competency domains: Knowledge for Practice, Patient Care, Interpersonal and Communication Skills, Practice-Based Learning and Improvement, Systems-Based Practice, and Professionalism. Across the FCC year, including core clerkships, electives, and longitudinal courses, 61 of 66 final competency-domain ratings were Target. No final FCC rating in Professionalism or Interpersonal and

Communication Skills was Below Threshold. Under Vanderbilt's published framework, "Below Threshold" indicates failing performance, "Threshold" indicates marginal performance that meets expectations in some areas but not all, and "Target" indicates performance meeting all expectations.

78. Pediatrics, Psychiatry, Medicine, and Surgery each concluded Target in all six competency domains. Those clerkships provided consolidated passport materials or a personalized dated and timed schedule serving the same organizational function to all students.

79. Among the six core clerkships, Neurology and OB/GYN were the two without an equivalent consolidated scheduling structure. Those were also the two core clerkships in which Vanderbilt documented the alleged administrative or professionalism difficulties later invoked against Randon; in Neurology, the attendance difficulty ceased after Vanderbilt provided explicit feedback.

80. Neurology concluded Target in five of six domains, including Professionalism and Interpersonal and Communication Skills. The only non-Target domain was Knowledge for Practice after an initial shelf-examination score; Randon remediated and passed the shelf examination, and Vanderbilt reconciled the domain to Threshold and the clerkship grade to Pass.

81. After Neurology gave Randon explicit feedback concerning didactic attendance, its final record states that she "did not miss any additional didactic sessions during the block."

82. During the FCC year, clinicians completed 53 workplace-based assessments of Randon's directly observed performance. None generated a concern flag. Evaluators repeatedly described professionalism, organization, communication, reliability, teamwork, receptiveness to feedback, and effective patient interaction.

83. Across 69 WBA and MCT direct-observation assessments, 68 did not generate the adverse concern designation.

84. The FCC Promotions Committee itself acknowledged progress. Its Cycle 1 materials stated that the Committee was “pleased to hear that there has been some progress made” in Professionalism and Interpersonal and Communication Skills and recognized Randon’s active participation in EXCEL.

85. Vanderbilt’s own EXCEL coach, Dr. Moutsios, likewise documented conduct directly inconsistent with an inability to self-correct: she described Randon as a “model student” in the coaching relationship and documented that she regularly arrived on time or early, used professional language, interacted professionally, was open and eager to participate, was receptive to suggestions about doing things differently, and readily co-created appropriate learning goals.

86. The most probative later evidence followed that assessment. After Randon finally received the Cycle 1 letter, she completed Surgery, her final core clerkship, and earned Target in all six domains. Faculty expressly documented promptness, preparation, receptiveness to feedback, and coachability.

87. Randon’s patient-facing performance remained strong. Vanderbilt did not identify Patient Care as a basis for dismissal, and Randon received Target in Patient Care in every core clerkship. Vanderbilt’s records included favorable comments concerning patient communication, rapport, empathy, presentations, notes, and clinical reasoning.

88. None of Vanderbilt’s identified post-notice concerns involved patient harm, unsafe clinical care, deficient clinical reasoning, or mistreatment of a patient; the cited concerns instead involved scheduling, attendance, forms, administrative process, responsiveness, and communication surrounding those obligations.

**F. Vanderbilt delayed critical feedback while later relying on an alleged inability to self-correct.**

89. The FCC Promotions Committee met for Cycle 1 on February 13, 2026, but Vanderbilt did not deliver the resulting letter to Randon until April 21, 2026, approximately 67 days later.

90. The Committee met again the next day, April 22, 2026. Randon therefore had effectively no interval between receipt of the Cycle 1 assessment and the next Committee review in which to act on the Committee's alleged written concerns and demonstrate sustained correction.

91. During the period when the Cycle 1 result remained undisclosed, Randon affirmatively sought feedback from VUSM leadership concerning the exact domains later invoked against her. On January 22, 2026, Dean Fleming wrote that she knew Randon had been "working very hard" and that the Promotions Committee would see that work. On March 5, 2026, after the Committee had already met but before Randon received its letter, Randon specifically asked how she was performing "from professionalism, academic and communication standpoints." Fleming responded that she was "very happy" to hear Randon's progress and offered to meet. On March 10, 2026, Fleming told Randon: "You are doing a great job of keeping people posted and aware of your meetings."

92. The Cycle 2 Committee met on April 22, 2026, but Vanderbilt did not deliver its determination until July 15, 2026, approximately 84 days later and after Randon's final core clerkship ended on June 26, 2026.

93. No subsequent core clerkship remained in which Randon could demonstrate additional correction before the August dismissal review.

94. Self-correction necessarily requires notice of what the institution expects corrected. Vanderbilt later relied on an asserted inability to self-correct while materially delaying the communication of the Committee's own assessments. Vanderbilt's own grading policies recognize

the same principle: significant performance concerns arising during required courses and clerkships are to be brought to students' attention sufficiently early to permit improvement.

**G. Several post-notice OB/GYN allegations later used in the progression process were materially inconsistent with contemporaneous records.**

95. Vanderbilt's Cycle 2 materials alleged that Randon had been offered coaching with the OB/GYN clerkship director, Dr. Maya Patel, but "never responded back accepting the offer." The contemporaneous record says otherwise.

96. Randon met with Patel on April 3, 2026, expressly accepted continued coaching, exchanged phone numbers, and agreed to a follow-up call. After Patel's clinic caused her to miss that scheduled call, Randon continued seeking follow-up on April 21, 2026, May 4, 2026, June 23, 2026, July 3, 2026, and through Dean Fleming on July 14, 2026; Randon ultimately met with Patel and Fleming on July 28, 2026. The coaching relationship was one Randon pursued, not one she declined.

97. The same Cycle 2 materials stated that Randon "often" texted faculty and house staff after hours about the following day. Randon reviewed and produced the OB/GYN text messages at issue to Vanderbilt; the texts were sent between approximately 7:23 a.m. and 3:20 p.m. The contemporaneous record therefore did not support a recurring pattern of after-hours texting.

98. Vanderbilt also criticized Randon for not submitting an absence form after an Associate OB/GYN Clerkship Director, who supervised her at the time, told her that the early dismissal at issue did not require one.

99. VUSM's FCC attendance policy permitted senior residents and attending physicians to give students time off from clinical duties when conditions permitted and required an absence-request form when such time off was expected to exceed 24 hours; the OB/GYN clerkship's absence policy reiterated that rule.

100. Randon's early dismissal did not exceed 24 hours, no mandatory session was missed, and she promptly disclosed the Associate Clerkship Director's instruction to Dr. Patel.

101. Another Cycle 2 allegation stated that Randon had emailed an attending that she would be late and then did not appear. Vanderbilt did not identify the attending, date, or underlying communication to Randon; the allegation did not appear in the final OB/GYN evaluation and had not been communicated to her in any contemporaneous clinical feedback, or in formal evaluations submitted by attendings that directly observed her.

102. On July 6, 2026, Randon completed an OB/GYN MCT after a scheduling problem in which Vanderbilt's revised schedule sent to her lacked times and earlier scheduling materials had contained an acknowledged student-name error.

103. The resulting adverse MCT was not posted until July 21, 2026, fifteen days later.

104. Randon had requested feedback on the day of the encounter, but the adverse comments were not communicated then.

105. The form recorded "2-3 encounters" although Randon had one fully observed encounter with the attending, and the form assigned adverse ratings to skills the attending indicated on the form were "not observed," in totality, raising questions about the reliability of the form as a record of the observation Vanderbilt later used in the dismissal process.

106. The FMK Cycle 3 letter expressly provided that MCTs would discuss observations at monthly meetings and that "Dr. Apple, who oversees this program, will inform you, FCC Leadership and the FCC Promotions Committee of any major concerns."

107. Dr. Apple never communicated any MCT concern to Randon, major or otherwise, during the 2025-2026 academic year or afterward.

108. On information and belief, Vanderbilt nevertheless relied on the July 2026 OB/GYN MCT in the dismissal process.

109. These discrepancies matter because Vanderbilt's ultimate rationale was not merely that concerns had once been raised; it concluded that Randon was unable to identify, correct, and sustain expected behavior. Vanderbilt's contemporaneous records documented requested feedback, actual correction, and successful later performance, while material alleged concerns were delayed, inaccurately characterized, or not timely communicated.

**H. Vanderbilt dismissed Randon on a stated theory of persistent communication/professionalism concerns and inability to self-correct.**

110. On August 18, 2026, Vanderbilt dismissed Randon from VUSM.

111. The dismissal letter relied on "persistent concerns regarding communication (ICS) and professionalism". From that longitudinal history Vanderbilt drew a broader conclusion: that Randon's "inability to consistently self-correct and sustain the expected professional behaviors" raised serious concerns.

112. The historical record was not new information in August 2026. Vanderbilt had already reviewed the pre-FCC record repeatedly through successive Promotion Committee cycles before choosing continued enrollment, remediation, and advancement into clinical training and represented that Randon was capable of success.

113. The legally relevant post-notice question was therefore whether Randon could meet Vanderbilt's essential requirements with reasonable accommodation after Vanderbilt received the completed diagnosis and specific request in October 2025.

114. The post-October 2025 period therefore supplied the period in which Vanderbilt could have evaluated whether the newly documented disability barriers could be reasonably accommodated, while preserving the same standards.

115. Vanderbilt did not dismiss Randon for failing a core clerkship. She had passed all six. It did not identify Patient Care as the basis for dismissal. Her final Patient Care rating was "Target" in every core clerkship.

116. Before dismissal, no individualized clinical or didactic accommodation addressing the documented executive-functioning or social-communication barriers had been implemented in the environments materially implicated in the later concerns.

117. The dismissal decision did not identify an individualized assessment of whether Randon could meet Vanderbilt's unchanged professionalism and communication requirements with the requested accommodations or an effective alternative.

118.. The dismissal decision did not address or explain why the requested accommodations would fundamentally alter VUSM's program.

119. After dismissal, Deans Fleming and Vinson informed Randon that, despite the extensive handover promised between the FMK and FCC committee, faculty, and leadership, her diagnosis, accommodation request, accommodations, and related barriers were not discussed at the August 11, 2026, dismissal meeting.

120. The Committee therefore concluded Randon lacked the capacity to consistently self-correct without meaningful consideration of the completed ASD diagnosis, the documented functional limitations, the October 2025 accommodation request, or the fact that no individualized clinical or didactic accommodation had been implemented.

122. During the relevant period, Pettepher held a VUSM medical-student assessment and progress role within Undergraduate Medical Education. Vanderbilt's published description of the Assistant Dean for Medical Student Assessment role included communicating with Student Access when a student required accommodation; preparing Promotion Committee agendas; assembling

academic data for review; attending committee meetings and reporting student progress or concerns; following up after meetings; and maintaining access to academic records. In Randon's case, Pettepher also transmitted the FCC Promotion Committee letters to Randon, including the Cycle 1 and Cycle 2 letters that were delivered substantially after the meetings at which the Committee had acted.

123. Pettepher also served as an administrative conduit for information moving between Randon and the Promotions Committee.

124. Randon provided Pettepher contemporaneous information disputing material performance allegations and information intended for the Committee; the resulting Committee letters do not identify those disputes as materials received or considered, even where they identify other submissions.

125. Randon's Portfolio Coach also provided information to Pettepher during a year in which he was not consistently present at the Promotion Committee meetings where Randon was discussed.

126. Vanderbilt nevertheless possessed the disability-related information institutionally for months before the August 11 review. Student Access had the completed evaluation and accommodation request by October 2025; Deans Fleming and Vinson had notice of the emerging diagnosis in September 2025; the FMK Promotions Committee had received Dr. Porter's letter; and Vanderbilt had represented that there would be a formal handoff and extensive handover into FCC.

127. Either the FCC Promotions Committee received some disability-related information through the handoff Vanderbilt represented and nevertheless made its incapacity determination without meaningfully considering that information, or Vanderbilt failed to transmit material

disability-and-accommodation information to the Committee despite the institutional notice and handoff process described above.

128. Under either alternative, the Committee determined that Randon was unable to self-correct without a meaningful assessment of her documented functional limitations, her accommodation request, or the absence of an implemented clinical or didactic accommodation.

**I. Vanderbilt's dismissal procedure required presentation of mitigating circumstances before the Committee, but that step did not occur.**

129. VUSM's Academic Year 2025-2026 Student Progress and Promotion Policy governs dismissal. It states that, before the Promotion Committee meeting on dismissal, the Senior Associate Dean for Medical Student and Alumni Affairs "meets with the student before the committee meeting to hear the student's explanation, including any mitigating circumstances that could affect the committee's recommendations."

130. The same policy provides that the Senior Associate Dean then "presents the student's explanation, as well as any mitigating circumstances, to the Promotion Committee," unless the student uses one of the specified alternative means of presentation.

131. Randon did not receive the required pre-dismissal meeting with the Senior Associate Dean before the August 2026 dismissal review for the purpose of presenting her explanation and mitigating circumstances.

132. Her completed autism diagnosis, documented functional limitations, October accommodation request, non-implementation of the requested clinical/didactic modifications, evidence of later correction, and contemporaneous disputes concerning the post-notice allegations were material mitigating information bearing directly on the asserted inability to self-correct.

133. Consistent with Fleming's later confirmation, that material disability-and-accommodation context was not presented and considered through the pre-dismissal process Vanderbilt's policy prescribed.

**J. The Review Panel had actual knowledge of the disability issue but did not address qualification with accommodation in its written decision.**

134. On September 3, 2026, Randon timely appealed the August 18, 2026, dismissal and raised the incomplete accommodation process for her known ASD diagnosis, procedural irregularities, and disputed characterizations of professionalism concerns with supporting exhibits.

135. Randon's appeal included Dr. Porter's original letter to the FMK Committee on September 2, 2025, Dr. Sandhu's evaluation, Randon's October 2025 Student Access communications, her clinical-year assessments, contemporaneous records addressing the OB/GYN allegations, and an initial proposed accommodation plan.

136. The appeal also included a letter from Dr. Dave Caudel, Executive Director of Vanderbilt's Frist Center for Autism and Innovation, who asked Vanderbilt to reconsider the dismissal and explained that several cited concerns implicated autistic needs for time-management support or common misinterpretations of autistic communication styles.

137. The appeal further included support from faculty who had directly observed Randon during the 2025-2026 academic year, including Dr. Davidson and Dr. Moutsios, and medical-education literature concerning autistic medical students and medical professionals..

138. The appeal did not ask Vanderbilt to excuse past conduct; it asked Vanderbilt to address the distinct prospective question—whether Randon could meet its unchanged standards with reasonable accommodation and requested reversal and return of the matter for further consideration with the disability-and-accommodation record before the decisionmakers.

139. VUSM's 2025–2026 appeal policy required the Senior Associate Dean for Undergraduate Medical Education, William B. Cutrer, M.D., M.Ed., during AY 2025–2026, to make "any relevant information/documentation" available to the review panel, including all assessment components of the student's portfolio. This was a distinct role from Dean Fleming's position as Senior Associate Dean for Medical Student and Alumni Affairs. The policy also expressly permitted the student to be present and/or make a written presentation containing supporting documentation from faculty members and other sources. If the review panel reversed dismissal, the policy authorized it to provide written findings and return the matter to the Promotion Committee for consideration of probation.

140. On Friday, September 11, 2026, at approximately 3:45pm, Randon met with the Review Panel.

141. Three days later, on Monday, September 14, 2026, at approximately 9:00 am, Vanderbilt delivered a printed and signed letter indicating they upheld the dismissal.

142. The appeal decision stated that multiple violations reflected in records dating to 2023 were not "explained or excused" by Randon's statements. That framing did not resolve the argument Randon had presented: whether Vanderbilt had ever determined that she could not meet its unchanged standards with the reasonable accommodations requested 10 months before her dismissal.

143. The written appeal decision did not mention Randon's autism, anxiety, or depression diagnoses; Dr. Sandhu's evaluation and documented functional limitations; the October 2025 accommodation request; the absence of any implemented clinical or didactic accommodation; Dr. Porter's, Dr. Caudel's, Dr. Kirabo's Dr. Davidson's, or Dr. Moutsios's letters detailing their

knowledge of the diagnosis, alleged concerns, and support for continued enrollment; Randon's written appeal; or any exhibit submitted with it.

144. The written appeal decision did not identify a determination that Randon's requested modifications were unreasonable, ineffective, or fundamentally altering.

145. The written appeal decision did not identify any effective alternative accommodation that Vanderbilt had offered before dismissal.

146. The written appeal decision did not identify whether or how they determined Randon could not meet Vanderbilt's unchanged standards with reasonable accommodation.

147. Whatever occurred during the Panel's deliberations, the final decision made no accommodation-and-qualification determination. The appeal was Vanderbilt's final opportunity to correct the omission before Randon's exclusion became final.

**K. Vanderbilt's dismissal interrupted both Randon's medical and scientific training.**

148. Before dismissal, Randon had completed all six core clerkships and had progressed to the point that Vanderbilt had formally admitted her to the graduate phase of the MSTP in Human Genetics.

149. Randon had joined the laboratory of Dr. Annet Kirabo, established a research project involving a clinical drug trial concerning salt-sensitive hypertension, and enrolled in first-year graduate courses for the planned Ph.D. phase.

150. As a result of the dismissal, Randon lost her place in the M.D./MSTP program, her associated stipend and scholarship support, and the planned continuation of her graduate research training.

**L. Vanderbilt's written progression procedures imposed specific requirements before dismissal.**

151. VUSM's Academic Year 2025-2026 Student Progress and Promotion Policy governs dismissal. It states that, before the Promotion Committee meeting on dismissal, the Senior Associate Dean for Medical Student and Alumni Affairs "meets with the student prior to the committee meeting to hear the student's explanation, including any mitigating circumstances that could affect the committee's recommendations."

152. Randon did not receive that pre-dismissal meeting. On August 7, 2026, and August 10, 2026, she asked what information the Committee would consider and what specifically she was being asked to address, but she was not given the specific allegations that would be considered at the August 11, 2026, dismissal review.

153. She was instead informed that the committee would have her “entire portfolio”.

154. VUSM policy states the mitigating circumstances will be brought to and considered by the promotions committee.

155. Randon's completed ASD diagnosis, documented functional limitations, October 2025 accommodation request, absence of any implemented clinical or didactic accommodation, and evidence of correction under structure and direct feedback were not meaningfully presented and considered through that prescribed process.

156. VUSM's Student Progress and Promotion Policy required a probation letter to identify the conditions for removal of probation, "including an expected time frame." The September 16, 2025, letter prescribed six prospective monitoring and remediation measures but did not identify an expected time frame for satisfying them or for determining whether probation could be lifted.

157. Vanderbilt's Portfolio Review Process states that, during student-coach meetings, coaches and students "review assessments, discuss and attempt to resolve any differences in progress level determinations, and review the learning goals and plans for appropriateness."

158. The Portfolio Review Process further provides that unresolved differences are identified in the coach assessment and that the student self-assessment, coach assessment, and joint assessment are retained in the portfolio and available to the Promotion Committee.

159. Randon raised disputed performance characterizations and supplied formal learning goals, but that prescribed review-and-documentation process did not occur with her disputes.

160. The FMK Cycle 3 letter expressly provided that MCTs would discuss observations at monthly meetings and that "Dr. Apple, who oversees this program, will inform you, FCC Leadership and the FCC Promotions Committee of any major concerns."

161. No major MCT concern was communicated to Randon through that promised process before Vanderbilt relied on the July 2026 MCT in the dismissal process.

## COUNT I

## TITLE III OF THE AMERICANS WITH DISABILITIES ACT — FAILURE TO MAKE REASONABLE MODIFICATIONS

162. Randon incorporates the previous paragraphs by reference.

163. Randon has disabilities within the meaning of 42 U.S.C. § 12102, including Autism Spectrum Disorder, Generalized Anxiety Disorder, and Major Depressive Disorder. These impairments substantially limit major life activities including learning, thinking, concentrating, communicating, and interacting with others, and the operation of major bodily functions, including neurological functions. See 42 U.S.C. § 12102(2); 28 C.F.R. § 36.105(d)(2)(iii).

164. Vanderbilt operates a public accommodation within the meaning of 42 U.S.C. § 12181(7)(J) and is subject to Title III.

165. Randon was otherwise qualified to participate in Vanderbilt's M.D./MSTP program with or without reasonable accommodations.

166. Randon could meet Vanderbilt’s essential academic, clinical, patient-care, communication, and professionalism requirements with or without reasonable accommodations.

167. Vanderbilt had actual notice of disability before the formal October request: the FMK Promotions Committee received Dr. Porter’s September 2, 2025 letter connecting Randon’s interpersonal difficulties to emerging ASD findings and recommending specialized support, and Randon directly informed Deans Fleming and Vinson on September 16, 2025, that the evaluation pointed to ASD.

168. No later than October 4, 2025, Student Access and VUSM had the completed evaluation, final diagnoses, documented functional limitations, and formal request for non-testing accommodation.

170. On October 4, 2025, Randon expressly asked Student Access to work with her on accommodations “outside of testing scenarios, too.”

171. Randon completed the steps Vanderbilt directed: she submitted the full evaluation, filed the additional accommodation request, attended the October 14, 2025 Student Access meeting, followed Student Access's direction to raise her needs with VUSM, accepted Vanderbilt's remedial support, and continued seeking clarification and support from clinical faculty and Deans.

172. Randon proposed concrete modifications tied to those documented limitations. On October 14, 2025, Randon requested a consolidated passport-style source for clinical requirements and raised disability-linked needs concerning notice and clarification of changes, structures for direct and actionable feedback, and sensory-regulation or break support. None of those modifications would lower or waive an essential academic, clinical, attendance, communication, or professionalism requirement.

173. Those modifications were objectively reasonable.

174. Comparable organizational structures already existed in Vanderbilt clerkships, and Randon's successful performance in those settings provides concrete evidence of their feasibility and potential effectiveness. The essential requirements remained punctual attendance, compliance with obligations, professional communication, and competent clinical performance; the requested modifications concerned the means by which Vanderbilt communicated and organized its own scheduling and logistical information, not alteration of those substantive requirements.

175. Vanderbilt did not provide the requested modifications or an effective alternative individualized accommodation addressing the identified clinical and didactic barriers before dismissing Randon, and it did not identify a determination that the proposed modifications were unreasonable or fundamentally altering.

176. That denial impaired Randon's access to required clinical and didactic education independently of Vanderbilt's later dismissal decision.

177. By failing to make reasonable modifications necessary to afford Randon full and equal access to its educational program, Vanderbilt violated 42 U.S.C. § 12182(b)(2)(A)(ii).

**COUNT II**

**SECTION 504 OF THE REHABILITATION ACT — FAILURE TO ACCOMMODATE**

178. Randon incorporates Paragraphs 1 through 161 as if fully set forth herein.

179. Vanderbilt receives federal financial assistance and is subject to § 504, 29 U.S.C. § 794.

180. Randon is an individual with disabilities, including Autism Spectrum Disorder, Generalized Anxiety Disorder, and Major Depressive Disorder, and was otherwise qualified to participate in Vanderbilt's program with reasonable accommodation.

181. Vanderbilt had actual notice of Randon's disabilities and need for accommodation. Relevant officials knew of the emerging autism diagnosis by September 2025; by October 2025,

Student Access and VUSM officials had the completed evaluation, documented functional limitations, and formal clinical/didactic accommodation request.

182. The requested modifications were necessary to address disability-created barriers to equal access and did not require Vanderbilt to lower or fundamentally alter its standards.

183. Vanderbilt failed to provide the requested reasonable accommodations or an effective alternative addressing those barriers.

184. Officials with authority to address Randon's access needs had actual knowledge that disability-related barriers were interfering with her clinical and didactic access and that she had requested accommodation. Those officials included, but are not limited to, Dean Fleming, who knew of the emerging diagnosis and recommended support by September 2025 and was responsible under VUSM policy for presenting mitigating circumstances to the FCC Promotions Committee.

185. The Review Panel later also had actual knowledge of the completed diagnosis, documented limitations, unmet request, and absence of any implemented clinical or didactic accommodation, and had authority to reverse the dismissal and return the matter to the Promotion Committee. Despite that knowledge and authority, Vanderbilt did not implement the requested reasonable modifications, identify an effective individualized alternative, or undertake the required accommodation-and-qualification analysis before the exclusion became final.

186. Vanderbilt thereby denied Randon equal access to its federally funded educational program by reason of disability, in violation of § 504. Its deliberate indifference supports compensatory relief to the extent authorized by law.

## COUNT III

## TITLE III OF THE AMERICANS WITH DISABILITIES ACT — DISABILITY-BASED EXCLUSION AND DISMISSAL

187. Randon incorporates Paragraphs 1 through 161 as if fully set forth herein.

188. Randon's dismissal claim concerns Vanderbilt's post-notice conduct. By October 2025, Vanderbilt had the complete diagnosis and specific accommodation request and was in a position to respond before making the August 2026 exclusion decision.

189. Vanderbilt dismissed Randon based on an asserted inability to consistently self-correct and sustain expected professional behavior.

190. At the time of dismissal, Vanderbilt had not evaluated Randon's ability to satisfy those unchanged requirements after implementation of a reasonable individualized clinical/didactic accommodation addressing the documented executive-functioning and social-communication barriers.

191. Randon was otherwise qualified. Vanderbilt's own contemporaneous record included successful completion of every core clerkship, 61 Target ratings among 66 final competency-domain ratings across the FCC year, 53 WBAs without concern flags, documented correction after direct Neurology feedback, and an all-Target final Surgery clerkship documenting promptness, preparation, receptiveness, and coachability.

192. By excluding Randon without adequately accounting for her ability to satisfy Vanderbilt's essential requirements with reasonable modification, Vanderbilt discriminated against her on the basis of disability in violation of Title III.

## COUNT IV

## SECTION 504 OF THE REHABILITATION ACT — DISABILITY-BASED EXCLUSION AND DISMISSAL

193. Randon incorporates Paragraphs 1 through 161 as if fully set forth herein.

194. Randon was otherwise qualified to continue in Vanderbilt's program with reasonable accommodation.

195. Vanderbilt's stated dismissal rationale incorporated the consequences of disability-related barriers for which Randon had timely requested accommodation.

196. Vanderbilt had actual institutional notice of those barriers and requests but did not implement the requested reasonable modifications or an effective individualized alternative before relying on scheduling, attendance, administrative, and communication difficulties arising in those unaccommodated settings as part of the basis for exclusion.

197. The pre-FCC record did not independently require Randon's exclusion: Vanderbilt had already reviewed that record, continued her enrollment, accepted remediation, advanced her into clinical training, and represented that she was capable of success.

198. Before any FCC concern arose, Randon asked for organizational strategies; she then set formal professionalism and communication learning goals and repeatedly sought feedback. The later dismissal rested on Vanderbilt's asserted continuing pattern and inability to self-correct during the post-notice period.

199. Vanderbilt's post-notice record contained substantial evidence of correction and qualification, including the successful response to direct Neurology feedback and all-Target Surgery performance after the delayed Cycle 1 assessment was finally communicated.

200. Vanderbilt nevertheless excluded Randon without first evaluating her performance under reasonable accommodations directed to the documented barriers. The Review Panel, with knowledge of the diagnoses, documented limitations, unmet accommodation request, and absence of an implemented clinical or didactic accommodation—and with authority to reverse the dismissal and return the matter for further consideration—upheld the exclusion without making any determination on those issues.

201. Vanderbilt's institutional failure to address known disability-related barriers preceded, and contributed to, the very performance consequences later used to justify exclusion. That response to a known disability-access problem was clearly unreasonable and constitutes deliberate indifference.

202. Vanderbilt thereby excluded and denied Randon the benefits of its federally funded educational program solely because of her disability, including the consequences of its failure to provide necessary reasonable accommodation, in violation of § 504. Vanderbilt acted with deliberate indifference to Randon's federally protected rights, supporting compensatory relief to the extent authorized by law.

## COUNT V

## BREACH OF CONTRACT — TENNESSEE LAW

203. Randon incorporates Paragraphs 1 through 161 as if fully set forth herein.

204. The student-university relationship between Randon and Vanderbilt was contractual in nature. Vanderbilt's published School of Medicine policies, written FCC monitoring and remediation conditions, and dismissal and appeal procedures formed part of the terms governing that relationship and Randon's continued enrollment. To the extent any obligation described in this Count is not deemed express, Randon pleads an implied contractual obligation in the alternative.

205. Randon performed her contractual obligations or was excused from further performance by Vanderbilt's breaches. She accepted admission, remained enrolled, performed the academic and professional obligations required of her, complied with remediation and monitoring requirements, completed prescribed coaching, and passed each core clinical clerkship.

206. Vanderbilt materially breached specific written obligations governing the process used to dismiss Randon.

207. First, Vanderbilt's AY 2025-2026 Student Progress and Promotion Policy required the Senior Associate Dean for Medical Student and Alumni Affairs to meet with Randon before the dismissal committee meeting to hear her explanation and mitigating circumstances; Vanderbilt did not provide that required pre-dismissal meeting.

208. Second, Vanderbilt materially breached the related requirement within the same policy that Randon's explanation and mitigating circumstances be presented to the Promotion Committee through the prescribed process. Material mitigating circumstances, including the completed autism diagnosis, functional limitations, accommodation request, non-implementation of the requested modifications, evidence of correction, and contemporaneous factual disputes—were not presented and considered at any point through that required process.

209. Third, the FMK Cycle 3 letter expressly provided that MCT observations would be discussed at monthly MCT meetings and that "Dr. Apple, who oversees this program, will inform you, FCC Leadership and the FCC Promotions Committee of any major concerns." Dr. Apple never communicated any MCT concern to Randon. On information and belief, Vanderbilt nevertheless relied on the July 2026 OB/GYN MCT in the dismissal process.

210. Fourth, VUSM's probation policy required the written probation terms to identify the conditions for removal of probation, "including an expected time frame." Vanderbilt's September 16, 2025 letter imposed six prospective requirements but identified no expected time frame for satisfying them or for determining whether probation would be lifted. Vanderbilt nevertheless later relied on an asserted failure to demonstrate sufficiently sustained correction as a basis for dismissal.

211. Fifth, Vanderbilt's Portfolio Review Process required coaches and students to "review assessments, discuss and attempt to resolve any differences in progress level determinations, and

review the learning goals and plans for appropriateness," and required unresolved differences to be identified in the coach assessment with the resulting portfolio materials retained for Promotion Committee review. Randon raised disputed performance characterizations and supplied formal learning goals, but the prescribed review, attempted resolution, and documentation of those disputes did not occur.

212. Sixth, VUSM's probation policy required the written probation terms to identify the conditions for removal of probation, "including an expected time frame." Vanderbilt's September 16, 2025 letter imposed six prospective requirements but identified no expected time frame for satisfying them or for determining whether probation would be lifted. Vanderbilt nevertheless later relied on an asserted failure to demonstrate sufficiently sustained correction as a basis for dismissal.

213. These breaches were material. They deprived the Promotions Committee of the procedure Vanderbilt prescribed for presentation of mitigating information before dismissal; deprived Randon of promised notice of major MCT concerns; left material portfolio disputes without the prescribed review-and-documentation process; and left undefined the time over which the prospective correction Vanderbilt required was expected to be demonstrated.

214. As a direct and proximate result of Vanderbilt's breaches, Randon suffered loss of her place in the MSTP and M.D. program, educational and professional opportunity, financial losses, reputational harm, and other damages recoverable under Tennessee law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and award the following relief:

A. A declaration that Vanderbilt violated Title III of the ADA and § 504 of the Rehabilitation Act;

B. Appropriate preliminary and permanent injunctive relief, including reinstatement to Vanderbilt's MSTP and M.D. program in an appropriate academic status, subject to reasonable individualized accommodations and Vanderbilt's unchanged legitimate essential standards;

C. An order requiring Vanderbilt to conduct and implement an individualized accommodation process addressing Randon's documented clinical and didactic barriers and to refrain from using the consequences of unaccommodated disability-related barriers as a basis for exclusion without the analysis required by federal law;

D. Equitable relief necessary to correct the effects of the unlawful dismissal and contractual breaches;

E. Compensatory and other monetary damages to the extent authorized by § 504 and Tennessee law;

F. Pre-judgment and post-judgment interest as allowed by law;

G. Reasonable attorneys' fees and costs under 42 U.S.C. § 12205, 29 U.S.C. § 794a, and other applicable law; and

H. Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted, this the ___ day of October, 2026.

KOSTOPOULOS RODRIGUEZ, PLLC

By: */s/ Matthew J. High*
Matthew J. High (P82783)*
550 W. Merrill St., Ste. 100
Birmingham, Michigan 48009
313.327.3100
mhigh@korolaw.com

/s/ Edward I. Zwilling
Edward I. Zwilling (BPR#: 043934)
**LAW OFFICE OF EDWARD I. ZWILLING, LLC**
4000 Eagle Point Corporate Drive
Birmingham, AL 35242
Telephone: (205) 822-2701
Email: edwardzwilling@zwillinglaw.com

*Attorneys for plaintiff*

**Pro hac vice motion forthcoming*

PLEASE SERVE DEFENDANT VIA CERTIFIED MAIL:

Vanderbilt University
Office of General Counsel
Loews Business Tower
2100 West End Avenue, Suite 1100
Nashville, Tennessee 37203